OPINION OF THE COURT
Frank S. Rossetti, J.
The instant proceeding was commenced by order to show cause, granted May 3, 1999, wherein the petitioners applied for the appointment of a guardian for their son (hereinafter respondent), pursuant to article 81 of the Mental Hygiene Law. Based upon the petitioners’ moving papers and the expectation that respondent would oppose the relief sought, the court dispensed with the appointment of a court evaluator and assigned counsel to represent the rights and interest of said respondent. (See, Mental Hygiene Law § 81.10 [c] [2], [7]; [d], [g].) The court’s order provided, inter alia, for an evidentiary hearing to be conducted June 2, 1999 and, prior thereto, issue was joined by the filing of respondent’s answer, which basically denied all of the material allegations of the verified petition.
At the conclusion of the hearing, the court rendered a bench decision dismissing the petition based on petitioners’ failure to establish respondent’s incapacity and the necessity for the appointment of a guardian. (See, Mental Hygiene Law §§ 81.02, 81.15, 81.16 [a].) While the only issue remaining for judicial determination is the compensation of the court-appointed counsel, we deem it appropriate to expand on the reasons behind our dismissal since we have encountered a number of similar applications which we also believe should not have been brought. Hopefully a discussion of the relevant guardianship law as it applies to troubled young adults will alert attorneys and their clients to the problems in bringing proceedings such as the one at bar.
The subject petition was presented just two months short of respondent’s 18th birthday and it alleged he was not able to manage his affairs by reason of “mental infirmity.” The mental infirmity proffered was “attention deficit hyperactive disorder, oppositional defiant disorder and polysubstance abuse,” and his petitioner parents alleged their son “has suffered from these illnesses and events for many years.” The petition continued that respondent requires professional intervention, knowledgeable supervision and intensive counseling, and since he is not cooperative, “absent some indication of authority other than *790 parental,” he will not be able to return to the mainstream of life “after reaching majority.” Petitioners were seeking both personal needs and property management powers since, although respondent’s present assets are minimal, they (his parents) intend to transfer monies to him for their own estate planning purposes and they believe he should not be permitted to control such monies because of his abuse of drugs and alcohol.
While the primary impetus behind the enactment of Mental Hygiene Law article 81 was to provide a new, more individualized form of guardianship for the elderly, it is certainly usable for persons of any age, including young adults and even minors (see, 1 Abrams, Guardianship Practice in New York State, ch 6, § II, at 405-408). However, it is not some pro forma legal vehicle to be used merely to perpetuate parental control of an incorrigible child or as a parental tax planning device.[2] Parents may have a duty of support until age 21 (see, Family Ct Act § 413 [1] [a]; § 415; Social Services Law § 101), but upon reaching the legal age of 18 (see, CPLR 105 |j]; Domestic Relations Law § 2; General Obligations Law § 1-202), a son or daughter becomes an adult with full legal rights (cf, e.g., 45 NY Jur 2d, Domestic Relations, § 353). Among those rights are the right to choose his or her place of abode and to have control over his or her person and property. A guardianship, whether of a young adult or a senior citizen, involves limitations on those rights and a consequential loss of control over one’s life, to one degree or another. When the statute works properly, there is a correlation between the rights and control lost to a guardian and the matters the incapacitated person lacks functional capacity to adequately perform. Nonetheless, whatever the extent of a guardianship, it inevitably entails a deprivation of liberty and is therefore a legal proceeding of constitutional dimensions which entitles any prospective incapacitated person to constitutional due process protections (see, US Const 5th, 14th Amends; NY Const, art I, § 6). These include notice, a right to counsel and a judicial determination based on the highest burden of proof applied in civil proceedings (see, Mental Hygiene Law §§ 81.07, 81.10, 81.11, 81.12 [a]). It is thus a legal proceeding of considerable importance and should not be commenced lightly or without substantial cause and basis.
*791 Under article 81, the two essential requirements for appointment of a guardian are (1) necessity and (2) incapacity or consent. (See, Mental Hygiene Law § 81.02 [a].) Here, the respondent adamantly refused to have his parents appointed as his fiduciaries and it was incumbent upon them to prove by clear and convincing evidence that (1) appointment of a guardian was necessary for his personal needs and/or property management, and (2) he was likely to suffer harm because he is unable to provide for himself and cannot adequately understand and appreciate the nature and consequences of such inability. (See, Mental Hygiene Law § 81.02 [a], [b].) There is often an interrelationship between necessity and incapacity since the necessity for appointment generally arises from functional inabilities which make up incapacity. In making a guardianship determination, primary consideration is to be given to the functional levels and functional limitations of the alleged incapacitated person, and such consideration shall also include an assessment, inter alia, of any mental disability, alcoholism or substance dependence as defined in the Mental Hygiene Law (see, Mental Hygiene Law § 1.03 [3], [13], [41]; § 81.02 [c]).[3] The only indicated mental disability (see, n 3, supra) is mental illness which is defined as “an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.” (Mental Hygiene Law § 1.03 [20].) The two “disorders” petitioners allege here (see, at 789, supra) seemingly can be distilled in laymen’s terms to a rebellious youth with a short attention span. A bad attitude and a fickle nature may not make for an attractive personality, but they do not warrant the deprivation of constitutionally protected rights and liberty.
As to alcoholism and substance dependence, they are defined respectively as “a chronic illness in which the ingestion of alcohol usually results in the further compulsive ingestion of alcohol beyond the control of the sick person to a degree which impairs normal functioning,” and “the physical or psychological reliance upon a substance as defined in this section [see, Mental Hygiene Law § 1.03 (39)], arising from substance abuse” (Mental Hygiene Law § 1.03 [13], [41]). All that petitioners *792 have alleged, is substance abuse (i.e., “the repeated use of one or more substances” [Mental Hygiene Law § 1.03 (40)]), and while it appears respondent has experimented with more than one illegal drug, it was not shown that he had a chronic compulsion to rely thereon or that it has resulted in an inability to function on an everyday basis. The court certainly does not mean to minimize the dangers from substance abuse, but we would be ignoring common knowledge if we were to view such as an unusual or infrequent occurrence, particularly among teenagers and young adults. As noted, the threshold issue and fundamental basis for an article 81 guardianship are functional limitations (see, Bailly, Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01, at 248; § 81.02, at 257-258). Although an abuser of drugs and/or alcohol may at some point develop such limitations and disability (particularly where such abuse exacerbates other problems or conditions), the mere use or even abuse by itself does not generally demonstrate the necessary functional detriment, particularly in view of the high burden of proof required.
This court does not doubt the sincerity of petitioners in attempting to find a way to provide guidance and help for their immature and seemingly troubled son. The problems they face from his rebelliousness and use of drugs and alcohol are certainly shared by many families across the country. Nonetheless, while their child is still a child in many respects, they did not show by clear and convincing evidence that he lacks the functional mental or physical ability to provide for his own welfare. The proof established that he understands and appreciates the nature and consequences of his actions and knows right from wrong, notwithstanding a somewhat cavalier attitude toward the truth. Respondent may be immature, arrogant, irresponsible and subject to an unrealistic sense of entitlement, but such traits were not shown to rise to the level of a functional limitation. Although he could benefit from continued therapy, there are questions as to the effectiveness thereof when forced upon him by “hated” parents. Under the circumstances of this case and analogous proceedings, the granting of guardianship to the parents of an otherwise healthy and mentally competent child would be nothing more than a meaningless paper exercise. It has been said on numerous occasions that the courts should not be engaged in futile acts, and the judicial imprimatur sought by petitioners in this article 81 proceeding is not one which we believe was contemplated by the Legislature.
*793 As observed, the appointment of a guardian is a drastic remedy which involves an invasion of the respondent’s freedom and a judicial deprivation of his constitutional rights (see also, Matter of Seidner, NYLJ, Oct. 8, 1997, at 28, col 4 [Rossetti, J.]). Before petitioning for such relief, careful and serious consideration should be given to the foregoing and other relevant facts. Here that seemingly was not done. In any event, the bottom line is that this young man has the capacity to understand his problems and it was not shown that he is otherwise functionally incapable.
Turning now to what compensation is to be awarded to the court-appointed counsel, his affirmation of services indicates 21.6 hours expended and a billing rate of $300 per hour (i.e., $6,480). Petitioners’ attorney has submitted a letter response wherein he not only objects to the value or dollar amount of the requested compensation, but also because of an alleged overstatement of time. He then goes on to blame counsel for “vehemently opposing the application” and, implicitly, for criminal activity which respondent engaged in soon after the hearing.
We find such a letter both disingenuous and unprofessional. As a member of the bar, petitioners’ attorney should be well aware of the obligations of the court-appointed counsel to protect the rights and interest of his client and advocate his client’s position. It was petitioners’ attorney who insisted that the evidentiary hearing go forward even after lengthy conferences where the prospective deficiencies in his proof were pointed out by both the court and court-appointed counsel. Indeed, said counsel specifically objected to petitioners’ insistence on calling respondent as a witness because of the probable further damage such would cause to the already strained and tenuous relationship between him and his parents. Also, at one point prior to the hearing, respondent agreed to a guardianship as long as he did not have to return to the same school he was just in. This potentially amicable resolution was rejected by petitioners and their attorney. Rather than casting aspersions on the court’s appointee, said attorney and his clients should more properly reflect on the effects of their conduct on respondent.
We also reject the implication in petitioners’ attorney’s letter that the court-appointed counsel acted improperly in not representing respondent following said subsequent criminal arrest. Said counsel was appointed solely for this proceeding, he was not retained by respondent or his parents and such an ac *794 cusation further tainted petitioners’ attorney’s distasteful and offensive response to the noted fee application. In the final analysis, the petitioners were ill-advised to initiate the subject proceeding and their attorney should have been cognizant of its ultimate failure before the hearing herein, if not before drafting the moving papers.[4]
In any event, the court is satisfied that the hours expended by the appointed counsel were necessary and proper (16 such hours were for a round-trip visit to the respondent at a residential facility in Massachusetts). For all such services rendered, we deem it appropriate to award said counsel the sum of $5,400, which amount shall be paid by the petitioners in accord with section 81.10 (f) of the Mental Hygiene Law.
Finally, at the subject hearing we determined and directed that the records be sealed. This was based on a finding of good cause that first, disclosure of confidential medical and treatment information (see generally, CPLR 4504, 4507, 4508) would be potentially embarrassing and damaging to respondent, particularly with respect to his relationship with his parents and further treatment of his problems (including his alcohol and substance abuse [c/., 42 CFR ch I, subch A, part 2]). Second, there was no indicated public or other interest in disclosure of these essentially personal proceedings outweighing such potential injury. (See, Mental Hygiene Law § 81.14 [b]; cf., Mental Hygiene Law § 33.13 [c] [1].) In the interests of clarity and certainty, said sealing directive is reiterated in the instant order.
Accordingly, based on the foregoing and all proceedings heretofore had herein, it is ordered that the petition at bar be and hereby is dismissed, and it is further ordered that the petitioners shall pay, within 30 days of the date hereof, to Joel S. Kaplan, Esq., the sum of $5,400, as and for all legal services rendered in behalf of the respondent, and it is further ordered that if the petitioners fail to so comply with the aforesaid directive, then and in that event, upon an affirmation from Joel S. Kaplan, Esq., to the County Clerk confirming such noncompliance, said Joel S. Kaplan, Esq., shall be and hereby is authorized to enter a clerk’s judgment in his favor and against the petitioners in said amount, plus interest, costs and disbursements, said interest to run from September 22, 1999 to the date of entry thereof, and it is further ordered that the entire *795 record of the subject proceedings be and hereby is sealed, pursuant to Mental Hygiene Law § 81.14 (b), and that no person shall be authorized to access said record without a further order of this court, and it is further ordered that the clerk of the Guardianship Part shall forthwith mail a copy of the within memorandum and order to the parties first named above and to the petitioners and the respondent.

. To the extent such planning is basically for the sole benefit of parents, such also is not a proper consideration in determining the need for a guardianship for their son.

. Mental Hygiene Law § 81.02 (c) has not been amended to reflect the deletion of alcoholism and substance abuse from Mental Hygiene Law § 19.03 and their inclusion within the definition of mental disability (see, L 1992, ch 223, §§ 4, 12; see also, L 1992, ch 223, § 7).

. In making our determination on this issue, we have considered the noted counsel's affirmation of services, petitioners’ attorney’s letter (see, at 793, supra) and counsel’s letter in response thereto.